## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GRANT HEILMAN PHOTOGRAPHY, INC.**<br><br>v.<br><br>**McGRAW-HILL GLOBAL EDUCATION HOLDINGS, LLC, McGRAW-HILL SCHOOL EDUCATION HOLDINGS, LLC** | **CIVIL ACTION**<br><br>**NO. 17-694** |

## MEMORANDUM

**Baylson, J.**                                                                                    **May 2, 2018**

### I.        Introduction

In this copyright infringement action, Defendant McGraw-Hill Global Education Holdings, LLC ("McGraw-Hill" or "Defendant") has filed a Motion to Disqualify Plaintiff's Counsel, alleging that counsel for Plaintiff Grant Heilman Photography, Inc. ("Grant Heilman" or "Plaintiff") should be disqualified because they retained and consulted Plaintiff's former employee to obtain information regarding this case and other ongoing litigation against Defendant. Plaintiff's counsel is Harmon Seidman Bruss & Kerr, LLC ("Harmon Seidman").

Defendant's Motion must be considered in the context of a prior lawsuit between the same parties in this Court, and related litigation in other courts. Plaintiff serves as an agent for numerous photographers, in connection with the licensing of their photographic work product in various publications. As is well known, photographs are entitled to copyright protection. In this case, and similar cases, Plaintiff has acted on authorization by photographers to file lawsuits for damages under the copyright laws for unauthorized or excessive publication of photographs. It appears to be a general practice in the industry that when a publisher wishes to publish a specific photograph, there will usually be a quantity limit on the number of publications, or the quantity

of each publication, and a schedule of fees to be paid depending on the frequency and quantity of reproductions of the photograph.

Defendant is a large textbook publisher, who often includes photographs in its textbooks. Defendant recognizes the applicability of the copyright laws to its publication of photographs. In the prior case, after contentious discovery, Defendant eventually admitted liability for excessive publication of photographs and that it was liable for damages to the Plaintiff as agent for the photographers. One of the important facts developed in the prior litigation, discussed *infra*, is that Defendant apparently did not have any internal controls to regulate the quantity of textbooks that it was publishing containing photographs subject to payment of licensing fees, and thus was internally unaware that it was incurring liability to the Plaintiff, as agent for photographers, when it published textbooks.

The first action, which began in 2012, was the subject of extensive discovery, a mini-trial, a settlement, and dismissal. See Grant Heilman Photography, Inc. v. McGraw-Hill School Education Holdings, LLC, et al., No. 12-cv-2061-MMB (the "2012 Action"). However, the settlement agreement reached in the 2012 Action did not release potential future claims based on printing or distribution of Plaintiff's photos after the settlement date. (See ECF 41, Pl. Statement of Facts re: Def. Mot. for Partial SJ, ¶ 18).

On October 14, 2016, Defendant disclosed several unauthorized post-settlement printings of photographs for which Plaintiff owns licensing rights. (Id. ¶ 20). The disclosure led to the present lawsuit, which began in the Northern District of California on December 23, 2016. (ECF 1-1). Subsequently, the case was transferred to this Court on February 14, 2017. (ECF 1). The parties generally agree that Defendant is liable for copyright infringement, but disagree regarding

the measure of damages, and specifically, whether Plaintiff is eligible for statutory damages.[1] (See ECF 18, Def. Mot. for Partial SJ).

## II.    Procedural Background

The issue presently before the Court is whether the lawyers from Harmon Seidman, the law firm serving as Plaintiff's counsel, should be disqualified from the case as a result of their communications and entering into a consulting agreement with Defendant's former employee, Mari Masalin-Cooper ("Masalin-Cooper").  Defendant asserts that on August 31, 2017, the plaintiff in Robert Frerck v. McGraw-Hill Global Education Holdings, LLC, No. 16-cv-11605 (N.D. Ill.)—a case alleging copyright infringement by Defendant—disclosed for the first time in interrogatory responses that every lawyer at Harmon Seidman[2] had communicated with Masalin-Cooper beginning in August, 2016.  (ECF 30-4, Beall Decl. re: Mot. to Disqualify, Ex. B).  The interrogatory responses objected to the disclosure of the contents of most of such communications on the grounds of "attorney work-product."  (Id.).

As a result, Defendant sought the deposition of Masalin-Cooper, which took place on September 14, 2017.  (ECF 30-8, 30-9, Beall Decl. re: Mot. to Disqualify, Ex. F ("Masalin-Cooper Depo.")).  At multiple points during the deposition, Harmon Seidman attorney Alex Kerr instructed Masalin-Cooper not to answer Defendant's questions about Masalin-Cooper's

---

[1] The relevant statutory provision is 17 U.S.C. 504(a), which states, in pertinent part:
        (a) IN GENERAL.—Except as otherwise provided by this title, an infringer
        of copyright is liable for . . .
        (2) statutory damages, as provided by subsection (c).
This provision is read in tandem with 17 U.S.C. 412(c), which states in pertinent part, ". . . no award of statutory damages or of attorney's fees, as provided by sections 504 . . . shall be made for—
        (1) any infringement of copyright in an unpublished work commenced
        before the effective date of its registration[.]
[2] Maurice Harmon, Christopher Seidman, Amanda Bruss, and Alex Kerr.

interactions with Harmon Seidman attorneys on the grounds that the answers would reveal "attorney-work product" information. (Id. at 12:17-14:15, 23:1-24:1).

Shortly thereafter, on September 25, 2017, Defendant filed its Motion to Disqualify Harmon Seidman, together with the sworn declaration of Christopher P. Beall and six exhibits. (ECF 30 ("Mot. to Disqualify"), ECF 30-2 through 30-10 (Ex. A-G)). Following an extension in its time to respond, Plaintiff timely filed its response on October 23, 2017, together with five sworn declarations. (ECF 35 ("Response"), ECF 35-1 through 35-5). On October 24, 2017, Plaintiff filed a "supplemental declaration" of Amanda Bruss. (ECF 36). On October 30, 2017, Defendant filed a reply in further support of its motion, along with the sworn declaration of Michael Beylkin. (ECF 38, ("Reply"), ECF 39).[3] The Court held a hearing on February 20, 2018, during which two witnesses, Michael Beylkin and Elizabeth Seidlin-Bernstein, testified for Defendant and three witnesses, Amanda Bruss, Maurice Harmon, and Sonia Wasco, testified for Plaintiff. (ECF 51 ("Tr.")).

The factual background below is derived from, *inter alia*, Masalin-Cooper's deposition, the parties' declarations, and live testimony from the hearing.

### III. Factual Background

Masalin-Cooper began working at Defendant on September 24, 2012. During her time working at Defendant, Masalin-Cooper worked as Director of Creative Services and Content Licensing and as Director of Standards and Compliancy. At Defendant, she was deeply involved in discovery management and other litigation support, including with respect to the 2012 Action. In fact, according to attorney Michael Beylkin, who represented Defendant in the 2012 Action,

---

[3] Plaintiff filed objections to the declaration of Michael Beylkin on November 8, 2017 (ECF 43), to which Defendant filed a response on November 14, 2017. (ECF 44).

Masalin-Cooper was "the primary point of contact for all the litigation efforts for the Higher Ed Division of McGraw-Hill," and Masalin-Cooper assisted in "getting background information as to all the litigations, discovery materials, getting discovery information, witness prep, discussing potential witnesses," and other tasks. (Tr. 9:15-17; 9:20-23). Moreover, she oversaw the McGraw-Hill team responsible for suppressing the unauthorized images that were at issue in the 2012 Action. She also participated in telephone calls and meetings throughout the 2012 Action, and was privy to confidential litigation strategy discussions between Defendant's attorneys, as well as consultations between outside counsel and in-counsel counsel regarding Defendant's legal positions. (See Tr. 55:25-56:6 ("She was intimately involved in various issues related to litigation strategy as well as trial preparation and trial strategy."). She also participated in deposition preparation sessions and assisted in the collection of information for discovery. (Tr. 9:15-17; 9:20-23; 13:3-4).

Importantly, Masalin-Cooper submitted a sworn declaration in the 2012 Action on December 2, 2014, reproduced in its entirety below:

> Mari Masalin-Cooper, pursuant to 28 U.S.C. § 1746, states as follows:
>
> 1. I am Director of Licensing and Standards for Defendant McGraw-Hill Global Education Holdings, LLC (the "Higher Education Group"). I have personal knowledge of the matters stated herein.
>
> 2. I respectfully submit this declaration in support of McGraw-Hill's Opposition to Plaintiff's Motion for Permanent Injunction and Impoundment.
>
> **3. In my capacity as Director of Licensing and Standards for the Higher Education Group, I am presently overseeing efforts to ensure that none of the photos that were at issue in the "mini-trial" in this case is used in any future printing of Higher Education textbooks.**

4. **Specifically, working with a list containing both the Higher Education textbooks from the mini-trial and the at-issue photos from those textbooks, I have issued a directive to my department that those photos be removed from the master PDFs for those textbooks. Once the photos have been removed from the master PDF, then, if any of those textbooks are reprinted at any point, the reprinted versions will not include the removed photos.**

I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and correct.

(ECF 30-10, emphasis added).

The issues presented in the present litigation appear to arise directly out of the failure of Masalin-Cooper's directive, referred to in paragraph 4 of her 2014 declaration. In fact, on May 10, 2016, Masalin-Cooper was terminated "for cause" due to the failure of her team to suppress the content which was at issue in the 2012 Action (although Masalin-Cooper stated at her deposition that she believed she was "scapegoated").

On August 18, 2016, Masalin-Cooper sent an apparently unsolicited email to Harmon Seidman attorney Christopher Seidman, which stated:

Dear Christopher,

I have recently left McGraw-Hill in Dubuque and moved back to the greater Detroit area. I will be reopen my business, B2B Copyright in September.

As a Content Licensing Director for Cengage Learning, Copyright Clearance Center and McGraw-Hill Education, I have a deep and broad understanding of the business of permission/rights acquisition and the business contract and compliance of 3rd party content and media.

I am hoping to branch out my services to include consulting on the best publishing business practices of content licensing and contract compliance as it pertains to copyright.

Do you feel this type of consulting service would be a benefit to a firm like yours? Would you be willing to share your thought about

this type of consulting services and if there is a market for this service?

Any feedback about this service would be appreciated.

Thank you for your time and consideration.

Best,
Mari Masalin-Cooper[4]

Christopher Seidman did not respond to the email. Twelve days later, Masalin-Cooper sent another email, this time to Harmon Seidman attorney, Maurice Harmon:

Dear Mr. Harman, I [sic]

I've recently left McGraw-Hill in Dubuque, and moved back to the greater Detroit area. I will be reopen my business, B2B Copyright in September.

As a Content Licensing Director for Cengage Learning, Copyright Clearance Center and McGraw-Hill Education, I have a deep and broad understanding of the business of permission/rights acquisition and the business of contract compliance for the use of 3rd party content and media in educational learning products.

I am hoping to branch out my services to include consulting on the best publishing business practices of content licensing and contract compliance as it pertains to copyright.

Do you feel this type of consulting service would be a benefit to a firm like yours? Would you be willing to share your thoughts about this type of consulting services and the market for this service?

Any feedback about this service would be appreciated. Thank you for your time and consideration.

Best,
Mari Masalin-Cooper

_____

[4] According to Masalin-Cooper, she was aware at the time she sent the email that Harmon Seidman served as Plaintiff's counsel in multiple litigations against her former employer. (ECF 30-8, Dep. 50:2-4)

Two days later, Masalin-Cooper and Harmon spoke telephonically about Masalin-Cooper's professional background, experience, and work history at Defendant. Then, the two exchanged a series of emails and had another telephone conversation seeking to meet in person in New York City or Detroit. Harmon asked additional questions during this September 9, 2016 telephone conversation, regarding Masalin-Cooper's ability to contribute as an expert or fact witness in textbook publisher cases. The two never met in person.

On December 1, 2016, Masalin-Cooper sent a proposed consulting agreement to Mr. Harmon. On December 5, 2016, Harmon asked for clarification regarding Masalin-Cooper's consulting fees. On December 6, 2016, Masalin-Cooper responded by email with a revised consulting agreement. The final agreement stated that Masalin-Cooper would provide consulting and/or expert witness services concerning "Litigation involving McGraw-Hill Global Education Holdings LLC and McGraw-Hill School Education Holdings LLC." It specified that Masalin-Cooper had to retain all non-public information obtained from Harmon Seidman as confidential, and precluded Masalin-Cooper from working for any other person or party in the case for two weeks.

Later that day, Harmon Seidman attorney Amanda Bruss emailed Masalin-Cooper to confirm Harmon Seidman's agreement to the fees. Bruss stated to Masalin-Cooper that her questions were "regarding [Defendant's] databases [**and] not case specific but apply generally to all our cases involving [Defendant]**." (ECF 35-4, Ex. 1 to Bruss Decl. (emphasis added)). On December 8, 2016, Harmon Seidman issued a check for $600 for Masalin-Cooper's consulting services. (ECF 30-7, Check). The same day, Bruss and Masalin-Cooper spoke on the phone for approximately one hour, discussing Defendant's databases, permissions systems, and

licensing procedures.  At Masalin-Cooper's deposition, she responded several times to questions about her conversation with Bruss:

> Q. Okay. What was it that Miss Bruss asked you about?
>
> A. Okay. She wanted to know why the discovery was taking so long, why there was so much confusion about the discovery and why if it was, if it was legitimate, if it was taking too long because they legitimately couldn't do the discovery.
>
> Q. And just to be clear, the discovery that she's asking about is discovery in cases involving McGraw-Hill?
>
> A. That's correct.

(Dep. 19:14-23).

> Q. Tell me everything that you can remember about that conversation with Miss Bruss apart from what you've already told me?
>
> A. I wondered why they were concerned about how long it was taking. I asked those questions, why is this a concern. And I asked the question about the contracts themselves and if, you know -- I wondered why there wasn't a discussion about the permission contracts and the ability for McGraw-Hill to enter into an agreement that would provide -- with knowledge in entering into the agreement that they could actually comply to it.
>
> Q. I want to see if you can help me. When you said you wanted to know that -- why they weren't asking about certain contracts, can you be more specific?
>
> A. Not certain contracts, the overall language of the contract in the permissions agreements because the agreements are different from period to period to period. I was trying to understand why the delay was -- what was the idea and why was this an issue, and why not looking at the contracts and McGraw-Hill's ability to comply to the terms of those agreements.

(Dep. 21:1-21).

> Q. And the discussion that you had with Miss Bruss was in the context of litigation delay; correct?
>
> A. Yes.

> Q. And you were providing information to Miss Bruss that you had acquired while you were at McGraw-Hill?
>
> A. Yes.

(Dep. 23:21-24:1).

The only subsequent interactions between Harmon Seidman and Masalin-Cooper involved scheduling (and taking) her deposition, and a subsequent email to formally terminate Masalin-Cooper's consulting arrangement with Harmon Seidman.

Harmon Seidman, which has a "long history" of representing Plaintiff in contingency fee arrangements against Defendant, has developed a "deep institutional understanding" of Plaintiff's business, as demonstrated throughout the 2012 Action before this Court. (ECF 25, Pl. Opp. to Mot. to Disqualify, at 5). There is little doubt that Plaintiff would suffer prejudice as a result of replacing their counsel after nearly six years of litigation on the underlying issues in this case.

## IV. Parties' Contentions

Defendant characterizes Masalin-Cooper's role at Defendant as a pivotal litigation support employee. As a result, Defendant asserts that Masalin-Cooper possessed vital information of both a confidential and privileged nature. Given that the consulting agreement between Masalin-Cooper and Harmon Seidman was designated as concerning "Litigation involving [Defendant]," Defendant contends that the Court should assume confidential and privileged information was shared with Plaintiff, in violation of the Pennsylvania Rules of Professional Conduct. Moreover, because Plaintiff asserted work product protection during Masalin-Cooper's deposition, Defendant states that Harmon Seidman has created a grave situation in which an individual possesses confidential information with respect to two parties who are directly adverse to one another in litigation. Crucially, Defendant claims, the Court

must disqualify Plaintiff's counsel to safeguard the integrity of the proceedings and enforce the disciplinary rules.

Plaintiff characterizes Defendant's motion as a meritless litigation tactic. Masalin-Cooper, Plaintiff claims, is a material fact witness who is not required by the Professional Rules (applicable to attorneys) to refrain from voluntarily speaking with or consulting for Plaintiff's counsel. In fact, Plaintiff asserts, Masalin-Cooper did not share any confidential or privileged information that Plaintiff did not subsequently learn in other litigations through formal discovery processes. Because disqualification is disfavored and would prejudice Plaintiff, Plaintiff contends that it would be inappropriate here.

## V.     Legal Standards

The district court's power to disqualify an attorney derives from its inherent authority to supervise the professional conduct of attorneys appearing before it. United States v. Miller, 624 F.2d 1198, 1201 (3d Cir. 1980). Beyond an attorney's obligations under the Rules, "as members of the bar, [lawyers] owe a general duty to maintain public confidence in the integrity of the bar." In re Corn Derivatives Antitrust Litig., 748 F.2d 157, 161 (3d Cir. 1984).

Defendant's motion and subsequent briefing contend that Plaintiff's counsel should be disqualified based on violations of Pennsylvania Rules of Conduct 1.6 (Confidentiality of Information), 1.9 (Duties to Former Clients), 1.10 (Imputation of Conflicts of Interest: General Rule), 4.2 (Communication with Person Represented by Counsel), 4.3 (Dealing with Unrepresented Person) and 5.3 (Responsibilities Regarding Nonlawyer Assistance).[5]

---

[5] Eastern District of Pennsylvania Local Rule of Civil Procedure 83.6 contains the Rules of Attorney Conduct (the "Rules"). Rule IV(b) provides, with certain exceptions not applicable here, that "[t]he Rules of Professional Conduct adopted by this court are the Rules of Professional Conduct adopted by the Supreme Court of Pennsylvania."

When considering a motion to disqualify based on violation of a disciplinary rule, "courts consider the ends that the disciplinary rule is designed to serve and any countervailing policies, such as permitting a litigant to retain the counsel of his choice and enabling attorneys to practice without excessive restrictions." <u>Miller</u>, 624 F.2d at 1201. "The maintenance of the integrity of the legal profession and its high standing in the community are important additional factors to be considered." <u>Int'l Bus. Machines Corp. v. Levin</u>, 579 F.2d 271, 283 (3d Cir. 1978).

A court "should disqualify an attorney only when it determines, on the facts of the particular case, that disqualification is an appropriate means of enforcing the applicable disciplinary rule. <u>Miller</u>, 624 F.2d at 1201. Indeed, "[i]t is well settled in this District that disqualification is an extreme sanction that should not be imposed lightly," <u>O'Keefe v. Ace Restaurant Supply, LLC</u>, 2017 WL 1134124, at *3 (E.D. Pa. Mar. 27, 2017) (citations omitted), and "disqualification never is automatic." <u>Miller</u>, 624 F.2d at 1201.

Although Defendant's motion seeks disqualification, this Court "has a wide discretion in framing its sanctions so as to be just and fair to all parties involved." <u>Levin</u>, 579 F.2d at 279.

## VI. Analysis

The Court's first task is to determine whether Plaintiff's counsel violated any of the Pennsylvania Rules of Professional Conduct.

### A. Plain Language Analysis of the Rules of Professional Conduct

It is initially clear that Plaintiff's counsel did not violate Rule 4.2, as comment 7 to the Rule explicitly states that, "[c]onsent of the organization's lawyer is not required for communication with a former constituent." Thus, at least with respect to Rule 4.2, Plaintiff's counsel was not obligated to notify Defendant's attorneys of its communication with Defendant's former employee, Masalin-Cooper.

It is also clear that Plaintiff's counsel did not violate Rule 4.3, which requires counsel to correct misunderstandings about the lawyer's role. Here, Masalin-Cooper stated that she understood Harmon Seidman was Plaintiff's counsel in various litigations against Defendant.

Rules 1.6, 1.9, and 1.10 present more complicated issues. Defendant asserts that, by virtue of Rule 5.3(c), the attorneys at Harmon Seidman are responsible for engaging and entering into a contract with Masalin-Cooper improperly revealing (without the consent of Defendant) confidential and privileged information that she obtained as a "legal employee" of Defendant.

Rule 1.6 addresses confidentiality of information:

> (a)  A lawyer shall not reveal information relating to representation of a client unless the client gives informed consent . . .
> (d)  A lawyer shall make reasonable efforts to prevent the inadvertent or unauthorized disclosure of, or unauthorized access to, information relating to the representation of a client.
> (e)  The duty not to reveal information relating to representation of a client continues after the client-lawyer relationship has terminated.

Rule 1.9 addresses duties to former clients:

> (a)  A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent.
> (b)  A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client
> (1)  whose interests are materially adverse to that person; and
> (2)  about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter; unless the former client gives informed consent.
> (c)  A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:
> (1)  use information relating to the representation to the disadvantage of the former client except . . . when the information has become generally known; or

13

(2) reveal information relating to the representation . . .

Rule 1.10 concerns the imputation of conflicts of interests when legal personnel change firms:

> (b) When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter unless:
>
> (1) the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom; and
>
> (2) written notice is promptly given to the appropriate client to enable it to ascertain compliance with the provisions of this rule.

Notably, all of the above rules refer to "lawyers" as the relevant subject of the Rules of Professional Conduct. However, Rule 5.3, reproduced in its entirety below, makes clear that the Rules apply to "nonlawyer[s] employed or **retained by** or associated with [] lawyer[s]," and that lawyers can be responsible for such conduct under Rule 5.3(c) under certain conditions:

> Rule 5.3 With respect to a nonlawyer employed or retained by or associated with a lawyer:
>
> (a) a partner and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer.
>
> (b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and
>
> (c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if:

> (1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or
>
> (2) the lawyer is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and in either case knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

### i. The Court Will Rely on Rule 5.3

Plaintiff contends, with respect to Rule 5.3, that the term "nonlawyer employed or **retained by** or associated with a lawyer" refers only to paralegals and employees directly supervised by lawyers. (Emphasis added). Thus, they assert, because "Ms. Masalin-Cooper was not a lawyer or paralegal for [Defendant] her conduct was not governed by these professional obligations." (See ECF 55, Pl. Post-Hearing Brief, at 8 n. 44). While Masalin-Cooper herself is not governed by the Rules, supervising attorneys can be held responsible, through Rule 5.3, for the actions of those they retain or employ. See, e.g., Com v. Boring, 453 Pa. Super. 600, 610 n. 3 (1996) ("[I]t should be noted that Attorney Robertson could be held accountable for the [side-switching] investigator's conduct if the conduct was not compatible with the professional obligations of an attorney." (citing Rule 5.3(a), (b), and (c))).

In fact, the plain language of Rule 5.3 makes clear that it applies with full force to Masalin-Cooper, who was specifically "retained by" Plaintiff's counsel to provide consulting services. Masalin-Cooper's status as "retained by" Harmon Seidman is made even clearer by the fact that Plaintiff asserted "work product protection" objections at Masalin-Cooper's deposition in response to questions about Masalin-Cooper's interactions with Plaintiff's counsel.

Having established that Rule 5.3 applies to Masalin-Cooper's relationship with Plaintiff's counsel, the next question is whether Plaintiff's counsel violated 5.3 by virtue of this

relationship. Rule 5.3 has three subsections, (a), (b), and (c), each of which is further discussed below.

Rule 5.3(a) states in relevant part that "a partner [] in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer."[6] Comment 1 makes clear that this subsection requires partners to "make reasonable efforts to establish internal policies and procedures designed to provide reasonable assurance" that non-lawyers working for the firm "act in a way compatible with the" Rules.

Here, there appears to have been no policy or procedure by Plaintiff's counsel to check that Masalin-Cooper did not have privileged or confidential/proprietary information. Masalin-Cooper specifically stated in her initial emails to both Seidman and Harmon that she functioned as "Content Licensing Director" at Defendant. She also submitted a declaration in the 2012 Action, in which Harmon Seidman was Plaintiff's counsel. Harmon admitted that he did not "run a check" on Masalin-Cooper's name. (Tr. 107:9-16). Clearly, Harmon Seidman failed to run the proper conflict checks, including, as would have been appropriate here (given her employer), simply asking Masalin-Cooper about work she did in connection with the 2012 Action. Such a question would have revealed that Masalin-Cooper possessed substantial privileged and confidential/proprietary information.

As for Rule 5.3(b), it is clear that no attorney at Harmon Seidman had "direct supervisory authority" over Masalin-Cooper, as she was retained as a consultant and only spent approximately one hour speaking telephonically with Bruss.

---

[6] Plaintiff's counsel at the time that Masalin-Cooper interacted with them consisted of only two partners, Seidman and Harmon, while Kerr and Bruss were in non-managerial roles.

Rule 5.3(c) states, in relevant part, that a lawyer is responsible for conduct of the nonlawyer that violates the Rules if:

> (1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or
>
> (2) the lawyer is a partner [and] knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

It appears that, by its plain language, 5.3(c) applies to the present motion. It is irrefutable that Plaintiff's counsel, including partners Seidman and Harmon, had actual knowledge that Masalin-Cooper was an employee of Defendant who worked in content licensing,[7] and that neither they nor any other lawyer at the firm: (1) inquired whether Masalin-Cooper possessed confidential or privileged information, (2) warned Masalin-Cooper not to share confidential or privileged information during her consultancy, or (3) informed Defendant contemporaneously that they had hired Masalin-Cooper.

### ii. Relevance of Rule 1.9

This is where Rule 1.9 reappears in the analysis. Because Rule 5.3(c) applies, partners Harmon and Seidman are responsible for conduct of Masalin-Cooper that would violate Rule 1.9 if performed by a lawyer. Masalin-Cooper's engagement with Plaintiff's counsel was specifically targeted at Plaintiff's various litigations against Defendant. The present litigation was therefore included within the scope of her consulting work. As a result, if Masalin-Cooper were a lawyer, she would have violated multiple provisions of Rule 1.9, which, *inter alia*, prohibits lawyers who have formerly represented a client in a matter from knowingly

---

[7] For the reasons discussed earlier, Masalin-Cooper's position and declaration submitted in the 2012 Action put them on notice that Masalin-Cooper obtained information that was confidential, and almost certainly, privileged.

representing a person in a substantially related matter in which that person's interests are materially adverse to the interests of a former client, without the consent of the former client. Clearly, Plaintiff's interests are materially adverse to Defendant's in the present case. Moreover, the present litigation is substantially related to the 2012 Action, in which Masalin-Cooper heavily participated in a litigation support role—thereby acquiring both privileged and confidential information that is material to the present case. Therefore, the "former client" here is Defendant, the "matter" is the 2012 Action, the "substantially related matter" is the present action, and the "person" is Plaintiff.

In conclusion, Masalin-Cooper's actions would have violated Rule 1.9 if she were a lawyer, and, because Rule 5.3(c) applies, partners Seidman and Harmon are both responsible for such conduct. However, this is not the end of the inquiry.

### iii.  Relevance of Rule 1.6

The Court also finds that Masalin-Cooper revealed confidential and privileged information during her discussions with Bruss. This conduct would have violated Rule 1.6 if Masalin-Cooper were an attorney. She acquired information "relating to representation of" Defendant, by virtue of her extensive involvement in the 2012 Action in a litigation support role. She oversaw in-house discovery, including the actual collection process, and participated in deposition preparation. This topic, i.e., in-house discovery processes, was the same topic as Masalin-Cooper's one-hour conversation with Bruss which largely focused on the discovery process in which Plaintiff and Defendant were engaged in this second case.

At her deposition, Masalin-Cooper testified under oath that Bruss asked "why the discovery [in cases involving Defendant] was taking so long, why there was so much confusion about the discovery and why if it was, if it was legitimate, if it was taking too long because they legitimately couldn't do the discovery. (See Dep. 19:14-23). These questions, which Masalin-

18

Cooper acknowledges she answered, clearly probe for confidential, if not proprietary and privileged, information. To make matters worse, Masalin-Cooper, who was privy to McGraw-Hill's litigation strategy discussions during her time working for Defendant, made suggestions to Bruss regarding possible avenues to explore in litigation: "I asked the question about the contracts themselves and . . . why there wasn't a discussion about the permission contracts and the ability for McGraw-Hill to enter into an agreement that they could actually comply to it." (See Dep. 21:1-21).

Although Harmon, Bruss and Masalin-Cooper denied that any confidential, proprietary, or privileged information was shared, the Court is not required to or inclined accept these denials. Neither of them is in a position to make such a determination as a matter of settled fact. In the first place, Mr. Harmon was certainly on notice as to Masalin-Cooper's role at McGraw-Hill from her having filed a declaration in the prior litigation, as noted above. With this information, Mr. Harmon was duty bound to make further investigation once he received the communication from Masalin-Cooper, to assure himself that he was not going to be the beneficiary of confidential, proprietary, or privileged information. There is no showing that Mr. Harmon communicated any of these concerns to Ms. Bruss.

Furthermore, Masalin-Cooper, as Plaintiff points out dozens of times in their briefing, is not a lawyer. Masalin-Cooper is therefore ill-equipped to understand what constitutes privileged information, but she had reason to know that the information she was conveying to Plaintiff was arguably proprietary and/or confidential. Mr. Harmon's declaration states he "was unaware that Ms. Masalin-Cooper had been involved with or interacted in anyway [sic] with the attorneys representing [Defendant] in any capacity." (ECF 35-2, Harmon Decl., ¶ 15). This declaration

admits ignorance at the fact that Ms. Masalin-Cooper had filed declaration with the Court in the prior case specifically stating her involvement in this specific topic.

### iv. Plaintiff's Counsel Knew, Should Have Known, or, At Very Least, Should Have Known to Ask, Whether Masalin-Cooper Possessed Confidential and Privileged Information

<u>The Record of the Prior Case is Very Relevant</u>

This leads the Court to a different, but related, issue. Plaintiff's counsel should have known that Masalin-Cooper was privy to confidential, proprietary, and/or privileged information as a result of her role, fully disclosed to Plaintiff's counsel, as "Director of Content Licensing" at Defendant. The undersigned presided over a seven-day bellwether mini-trial between Plaintiff and Defendant arising out of the 2012 Action. The mini-trial, which took place between September 15, 2014 and September 23, 2014, was essentially confined to the narrow question of whether Plaintiff was entitled to statutory damages for copyright infringement by Defendant. One of the key claims made by Plaintiff's counsel was described in Plaintiff's opening address to the jury by Maurice Harmon, Plaintiff's counsel in the 2012 Action (and in the present case) as follows:

> The evidence will also show that McGraw had no system in place to even keep track of how many uses copies sometimes, or, you know, languages, or distribution, how it used the photographs of Heilman. So, here's -- the evidence will show here's a company that's very large and sophisticated, and makes its own intellectual property that is copyrighted, books, but yet it had no way to keep track of how many times and in what manner it used the third party, Heilman's photographs in its textbooks. That's what the testimony will be.

(2012 Action, ECF 229, Trial Transcript on 9/15/14, 22:4-13).

Thus, Plaintiff's counsel in the present case represented Plaintiff in the prior trial, in which there was extensive evidence and argument regarding the fact that Defendant knew or

should have known that it was producing excessive copies of textbooks containing Plaintiff's photographs with licenses that had been exceeded, or had expired.

Masalin-Cooper's Declaration in the Prior Case

Given Masalin-Cooper's role at Defendant in its licensing department, and the fact that she submitted a sworn declaration in the 2012 Action regarding the suppression of such photographs, it should have been obvious to Plaintiff's counsel that Masalin-Cooper was likely to have privileged and confidential/proprietary information. Masalin-Cooper's declaration, submitted in the 2012 Action, and reproduced in its entirety *supra*, provides even more context.

Submitted on December 2, 2014, Masalin-Cooper's declaration lists her role, states that she is "presently overseeing efforts to ensure that none of the photos that were at issue in the 'mini-trial' . . . is used in any future printing," and states that she personally "issued a directive to my department that those photos be removed." (See 2012 Action, ECF 208-7). Her role and job description both prove that she was crucially important to the process of ensuring compliance with licensing requirements. Given that Harmon Seidman was counsel for Plaintiff at the time, it cannot now claim that it was unaware that Masalin-Cooper may possess confidential or privileged information.

Masalin-Cooper should not have been retained as a "consultant" to provide information to Plaintiff's counsel about any substantially related cases.

**B. Applicable Caselaw**

Only one Third Circuit case cited by the parties approximates the situation presently before the Court.[8]  Although unpublished, De La Cruz v. Virgin Islands Water and Power

_____

[8] The other Third Circuit cases cited by the parties (many just for their standards) are In re Corn Derivatives Antitrust Litig., 748 F.2d 157 (3d Cir. 1984), United States v. Miller, 624 F.2d 1198, 1201

Authority provides this Court with a basic framework for analyzing Defendant's Motion to Disqualify.

> When a non-lawyer is accused of side-switching, a court must first determine whether the non-lawyer learned confidential information from his previous employer. If the non-lawyer learned confidential information from his or her previous employer, a rebuttable presumption arises that the information will be disclosed to the new employer. The burden then shifts to the firm opposing disqualification to show that no disclosure of confidential information has occurred. Evidence of formal screening mechanisms can be helpful in meeting this burden.

597 Fed.App'x 83, 89 (3d Cir. 2014).

Applying the logic of De La Cruz to the present case, it is clear that Masalin-Cooper learned confidential information from Defendant. As a result, a rebuttable presumption arises that the information was disclosed to Plaintiff's counsel, and Plaintiff's counsel has the burden to show that no disclosure of confidential information has occurred. As described above, this Court finds that disclosure of confidential, if not also privileged, information did occur. Thus, Plaintiff's counsel has failed to meet their burden. See Camden v. State of Md., 910 F. Supp. 1115, 1124 (D. Md. 1996) ("[I]t is not enough that Plaintiff be prevented from using Redmond's testimony in court. [Plaintiff's counsel] . . . has gained access to confidential information that is damaging to Defendants whether or not it becomes formal evidence in the case.").

In its Motion to Disqualify, Defendant cites a plethora of other cases as persuasive authority.[9] Generally speaking, these cases support the proposition, also supported in De La

---

(3d Cir. 1980), Int'l Bus. Mach. Corp. v. Levin, 579 F.2d 271 (3d Cir. 1978), International Business Machines Corp. v. Levin, 579 F.2d 271 (3d Cir. 1978), Bell Atl. Corp. v. Bolger, 2 F.3d 1304, 1316 (3d Cir. 1993), and E.E.O.C. v. Hora, Inc., 239 F. App'x 728, 731 (3d Cir. 2007).

[9] In re Columbia Valley Healthcare System, L.P., 320 S.W.3d 819 (Tex. 2010); In re Am. Home Prods. Corp., 985 S.W.2d 68 (Tex. 1998); Phoenix Founders, Inc. v. Marshall, 887 S.W.2d 831 (Tex. 1994); Lamb v. Pralex Corp., 333 F. Supp. 2d 361 (D.V.I. 2004) Rentclub, Inc. v. Transamerica Rental Fin.

Cruz above, that once a non-lawyer possessing material confidential information "switches sides" on the same case, a presumption attaches to the new employer that such information will be improperly shared. This presumption, the cases generally state, may be overcome by a showing of formal screening mechanisms. Based on these cases, it appears that in some jurisdictions, a showing of such mechanisms is the only way to overcome the burden and avoid disqualification. Most of these cases involve legal employees such as investigators, secretaries, and paralegals, who switch from one client's outside counsel to another. None of them involve in-house litigation support personnel (like Masalin-Cooper) who then provide limited consulting services to outside counsel.

However, nothing suggests that the present situation is distinguishable in any material respect. The extent (i.e., number of hours) to which Masalin-Cooper assisted Plaintiff's counsel speaks to the amount of prejudice that likely resulted, not to the propriety of such an arrangement in the first place. The arrangement was clearly improper, can could have been avoided through a screening mechanism, formal or informal, or a simple inquiry into Masalin-Cooper's litigation-related duties at Defendant. The fact that the improper arrangement resulted in only one hour of consulting services does not factor into this Court's analysis of whether the Rules were violated, especially because the Court finds that the one hour conversation was specifically targeted at acquiring privileged/proprietary information.

---

Corp., 811 F. Supp. 651 (M.D. Fla. 1992); Ullman v. Denco, Inc., No. 14-cv-843 SMV/GBW, 2015 WL 11111287 (D.N.M. April 22, 2015); Leibowitz v. Eighth Judicial Dist. Ct. ex rel. Cnty. of Clark, 78 P.3d 515 (Nev. 2003); Lansing v. Lansing, 784 So. 2d 1254 (Fla. 5th DCA 2001); In re Complex Asbestos Litigation, 232 Cal. App. 3d 572 (1991); Hodge v. URFA-Sexton LP, 295 Ga. 136 (2014); Stewart v. Bee-Dee Neon Signs, Inc., 751 So. 2d 196 (DCA Fla. 1st Dist. 2000).

Notably, consistent with the Rules, including Rule 4.2, Masalin-Cooper could have been interviewed or deposed, without compensation, as a fact witness.[10]  Instead of doing so, Harmon Seidman retained and paid Masalin-Cooper for information about her former employer.  Clearly, her value was derived from her knowledge of material facts and internal discovery processes, not her services as a "consultant and/or expert witness," as she was inaccurately described in her "consultancy agreement."

One final point bears mention.  Defendant has convincingly shown that Masalin-Cooper was privy to privileged information about the 2012 Action in her role at Defendant.  The present case is clearly substantially related to the 2012 Action, as discussed earlier.  At Masalin-Cooper's deposition, Harmon Seidman attorney Alex Kerr instructed Masalin-Cooper not to answer Defendant's questions on the grounds that the answers would reveal "attorney-work product" information.  (Id. at 12:17-14:15, 23:1-24:1).  Such questions related to Masalin-Cooper's conversations with Bruss as a "consultant."  Although Plaintiff's counsel later waived this protection at this Court's hearing on this motion, the fact remains that Masalin-Cooper was put in a position in which both sides credibly asserted she possessed privileged or confidential/proprietary information by virtue of her conversations with respective counsel.  If nothing else, this fact alone—i.e., that Masalin Cooper possessed privileged information (about material facts on substantially related cases) vis-à-vis both sides of the litigation—demonstrates that Masalin-Cooper's side-switching was much in the way of a "double agent."  Harmon

---

[10] The Court notes that, even if Masalin-Cooper were interviewed without compensation, as Rule 4.2 permits, counsel would be required to refrain from soliciting information protected by the attorney-client relationship.  Action Air Freight, Inc. v. Pilot Air Freight Corp., 769 F.Supp. 899, 902-04 (E.D. Pa. 1991) ("Rule 4.2 permits . . . counsel to make ex parte contacts with the former employees" of the adverse party but "[o]pposing counsel . . . must refrain from soliciting information protected by the attorney-client relationship.").

Seidman should have been more vigilant about retaining her, and its failure to do so warrants disqualification.

## VII. Conclusion

This Court is acutely aware of the prejudice that Plaintiff may suffer as the result of its counsel's improper and Rules-violating conduct. In fact, consistent with its obligation to consider such potential prejudice, the Court heard extensive testimony from Plaintiff regarding that topic. Moreover, the Court notes that Harmon Seidman has ably represented Plaintiff thus far. However, the Court is also tasked with protecting "the integrity of the legal profession and its high standing in the community." Levin, 579 F.2d at 283. The appearance of impropriety, and Harmon Seidman's lack of controls in ensuring compliance with the Rules, dictates that the proper result is disqualification. See U.S. v. Miller, 624 F.2d 1198 (Third Circuit affirmed disqualification of lawyer who violated New Jersey rule by switching sides.); In re Corn Derivatives Antitrust Litig., 748 F.2d at 162 (Third Circuit noted that, "[w]hile disqualification would serve to increase the costs of litigation for [plaintiff], it would be unfair, appearances apart, to permit [plaintiff's counsel] to use against its former client the information about the strengths and weaknesses of the case gained from [prior] joint representation."); IBM v. Levin, 579 F.2d at 283 (Third Circuit affirmed disqualification for law firm that represented both sides of litigation "as a vindication of the integrity of the bar," despite the fact that "specific injury to the moving party has not been shown.").

The Motion to Disqualify Plaintiff's counsel will be GRANTED.

An appropriate Order follows.

O:\CIVIL 17\17-694 Grant Heilman v McGraw-Hill\Memo Re Motion to Disqualify.docx